THE DOMESTIC TELEGRAPH AND TELEPHONE COMPANY

*v.*

THE METROPOLITAN TELEPHONE AND TELEGRAPH COMPANY, AND THE NEW YORK AND NEW JERSEY TELEPHONE COMPANY.

The complainant entered into a written contract with the Bell Telephone Company, of New York, by which the former was licensed to use the Bell telephone in the district comprised of the city of Newark and the townships of Harrison and Kearney for the term of five years, with an express stipulation that if at the end of the term the Bell company did not desire to run the district itself nor to merge it with any other, "but should desire to have such

Domestic Telegraph Co. v. Metropolitan Telephone Co.

business conducted for it, then the party of the second part (the complainant) shall have the first right of acquiring the license or agency to conduct such business, at such rate or rental and upon such terms as may then be fixed and determined by the party of the first part." The bill of complaint was amended, showing a subsequent parol agreement containing a promise to the complainant that if it would pay the cost price of the Western Union plant in its district, its license should be renewed for five years, with other conditions or provisions.—*Held*, that when in a contract there is a clause which provides that one of the parties shall have the first right to a new contract (not a renewal of the existing one), upon such terms as shall be fixed upon by the other party, and during the continuance of such contract new terms are added upon the assurance that such clause gives the right to renew, or will fully protect the right to renew, a court of equity ought to enforce such contract, and secure its renewal to the party to whom such promise is made, if the terms contemplated in the clause giving such first right have been fixed, or any principle acknowledged by the parties to be bound, by which they can be ascertained.—*Held also*, that in this case there was a distinct verbal promise to renew upon the conditions named.

On bill for injunction and specific performance.

*Mr. H. Young* and *Mr. T. N. McCarter*, for complainant.

*Mr. J. M. C. Morrow* and *Mr. J. D. Bedle*, for defendants.

Bird, V. C.

During the period of time that interests us in determining the rights of the parties to this controversy, there was the National or American Bell Telephone Company of Boston, spoken of as the parent company, of which Theodore N. Vail was general manager.

There was also the Bell Telephone Company of New York, which was a licensee of the American Bell, and the licensor of the complainant. E. Holmes was its president, A. S. Dodd treasurer, Theodore N. Vail and John D. Harrison were directors.

There was also the Domestic Dispatch Company of Newark, New Jersey, which afterwards became the Domestic Telegraph and Telephone Company of Newark, New Jersey, the complainant in this suit. George W. Hubbell was president, F. T. Feary, J. Feary and John D. Harrison were directors.

There was also the Western Union Telephone Company, which had control of other companies, and which was a rival to the companies above named.

After the foregoing companies had been engaged in business some time, a company was formed in the place and stead of the said Bell Telephone Company of New York, called the Metropolitan Telephone and Telegraph Company of New York. This company licensed the company afterwards organized, called the New York and New Jersey Telephone Company. The companies last named are the defendants in this suit. Theodore N. Vail, who was the general manager of the American Bell of Boston, and president of the Bell Telephone Company of New York, was, from its beginning, a director in the Metropolitan Telephone and Telegraph Company, and soon after became its president. John D. Harrison, who was a director in the Domestic Telegraph and Telephone Company of Newark, and in the Bell Telephone Company of New York, became a director in the Metropolitan Telephone and Telegraph Company, and also in the New York and New Jersey Company.

Thus it appears that Vail was interested in four of the companies named, Harrison in four, and Davis and Dodd in three New York companies—the Bell, the Metropolitan, and the New York and New Jersey.

From 1875 to August 6th, 1879, the Domestic company, the complainant, was serving the public in Newark, New Jersey, by receiving and delivering dispatches upon preconcerted signals, which were limited to a very few. The Bell company of New York, as the licensee of the American Bell of Boston, had the exclusive control of all the rights of the American Bell in the territory in and about the city of New York, including a radius of thirty-three miles from the city hall, and including, also, the county of Monmouth, in the state of New Jersey, but excluding the state of Connecticut.

On August 6th, 1879, a committee of the Domestic company, by authority of the board of directors, met the president and board of directors of the Bell company of New York, when a memorandum of or for an agreement was made by them respecting the

telephone business in Newark and the townships of Harrison and Kearney. That memorandum stated that the agreement should continue in force five years, and that "The Domestic company should have the first preference in making any contract at the termination of this agreement," and that it should at all times prosecute its business with all diligence, and that the exchange system should be established as soon as practicable, and in default thereof that the Bell company should have the right to purchase the property of the Domestic company, without regard to the good will of the business, at a fair valuation, to be decided by arbitrators if the parties could not agree. It also stated that all disagreements should be submitted to arbitration.

I give these points of the memorandum because the Domestic company immediately proceeded to act under them, and because it is urged that they assist materially in coming to a fair understanding of the conduct of the parties and of the agreement which was afterwards entered into by them. The Bell company at once commenced furnishing the Domestic company with instruments, and the latter company at once commenced operations under its license and prosecuted the business for many weeks before the more complete agreement was prepared and executed according to the minds of the parties.

After many weeks the Bell company of New York, by E. Holmes, president, and A. S. Dodd, secretary, and the Domestic company, by Geo. W. Hubbell, president, and F. T. Feary, secretary, executed an agreement more fully expressing the understanding of the parties. It was dated August 6th, 1879, and provided that it should continue in force until September 1st, 1884. It provided that the Bell company should furnish to the Domestic company all the instruments required for use in the district named, unless the demand therefor should exceed the ability of the Bell company to meet, in which case the Domestic company was to have a proper proportion of the instruments, considering the obligation of the Bell company to other licensees.

This last provision goes far towards establishing the proposition that the different licensees were all expected to come in under similar contracts, or that the terms of the license to one

were the same to all.   This now seems to be unquestionably true as to rentals, as will hereinafter appear.

The Domestic company agreed to pay an annual rental of $10 for every telephone delivered.   It also agreed to prosecute diligently the business of introducing said telephone in said territory in New Jersey, to the end of establishing a general system of telephonic intercommunication (known as the district exchange system) within and throughout the said city and townships in said state of New Jersey, and that, at the termination of said contract, it would redeliver said instruments to the Bell company.

It was also provided that, so long as the Domestic company performed the terms of the agreement, the Bell company would not authorize the use of telephones in the district, " so as to interfere in any manner with the said 'district exchange system' so to be established and built up."

The Bell company reserved to itself the right to establish communication between said district and other districts under the control of the Bell company; but when such communications should have been established, then the Domestic company, if requested so to do by the Bell company, would connect with such lines and receive such communications as might be transmitted, and would deliver them, and would transmit any that might be desired to be sent from said district to others.

The Domestic company agreed not to charge a higher rate for the use of said instruments than the average rate charged in other districts by the Bell company, or by those licensed by the Bell company, for corresponding service in similar districts.

I think this last provision indicates the object of the Bell company to be to establish a uniform system of telephonic communication throughout all the territory under its control, so that a contract between the Bell company and one of its licensees would be applicable to another.

The tenth section of the contract made it optional with the Bell company, its successors or assigns, to purchase from the Domestic company its telephonic lines and business, at fair prices, to be agreed upon at the time by the parties, without regard to

valuation for good will, and in case of disagreement the price should be fixed by arbitrators. But nothing was to be construed to make it obligatory upon the Bell company to purchase the business and property of the Domestic company.

The section of the contract of chief importance is the eleventh, which is in these words :

"If, at the expiration of the period of five (5) years, the party of the first part shall not desire to conduct the business of telephonic district exchange directly within said district of the party of the second part, or of merging said district into some other district, but shall, on the contrary, desire to have such business conducted for it, then and in such case the party of the second part shall have the first right of acquiring the license or agency to conduct such business at such rate or rental and upon such terms as may then be fixed and determined by said party of the first part."

The agreement then said that it was understood that diligence in establishing said business was of the essence of the contract, and declared that any failure in this respect might operate as a forfeiture.

When this contract was about expiring, the Domestic company filed a bill in this court against the said The Metropolitan Telephone and Telegraph Company, which was the successor of the Bell company, and also against the said The New York and New Jersey Telephone Company, which was the licensee of the Metropolitan company, praying for a renewal of the license granted by the Bell company upon such terms as might be fixed upon by the court, and for an injunction against both companies, enjoining them from removing any of the telephones in the possession of the Domestic company, and from refusing to deliver additional telephones according to said agreement, and from interrupting communication from, and from interfering in any other respect with the business of the Domestic company.

Upon filing this bill and the affidavits, an order to show cause why an injunction should not issue was allowed. Upon the hearing of a motion for a preliminary injunction, the answer of the defendants and the affidavits thereto annexed were read and considered. By their answer, the defendants insisted that said eleventh section of the contract was without any force or

effect; or, in other words, that it gave no rights whatever to the Domestic Company.

The injunction was denied. See *The Domestic Telegraph and Telephone Co.* v. *The Metropolitan Telephone and Telegraph Co. et al., 12 Stew. Eq. 160 ; S. C. on appeal* (sustaining the views of the vice-chancellor), *13 Stew. Eq. 287.* The opinion of the vice-chancellor proceeds upon the ground that the contract makes no provision to renew it at the termination of the first license, but only gives to the Domestic company the first right to such a license as the Bell company might offer, both as to terms and rates or rentals; or, in other words, upon the ground that the Domestic company presented no contract that the court could lay hold of to enforce.

The complainant obtained leave, and amended its bill. The allegations of the amendment are that on the 16th day of April, 1880, the Western Union Telephone Company was conducting the telephonic business in Newark, and was using Edison telephones to the number of about five hundred, and was a formidable rival to the complainant; and that prior to that time an arrangement had been made between the Western Union Telephone Company and the National Bell Telephone Company (the parent company), by which it became possible for the said parent company and its licensee, the Bell Telephone Company of New York, to purchase, at cost, the plant of the said Western Union company, in the city of Newark, and that to that end negotiations were commenced; and that during the pendency of said negotiations, and on the 16th day of April, 1880, the complainant was urged by the Bell company to purchase, and pay for said plant of the Western Union company, in Newark; and, as an inducement to said purchase by the complainant, and in consideration thereof, it was definitely agreed by the Bell company that if, at the expiration of the complainant's said contract, the said Bell company should determine to carry on said telephonic business in complainant's said district, it, the said Bell company, would purchase the complainant's plant, and pay therefor its increased cost by reason of the complainant's purchase of said plant of the Western Union company, and also that if,

at the expiration of said contract, it, the said Bell company, should determine not to conduct said business, it would renew the complainant's contract for the period of five years, upon the same terms as were provided for in the then existing contract, and would give to the complainant the benefit of any reductions in the rentals of its telephones, which were then made to any of its licensees ; and that it was also agreed that the complainant should have the benefit of any such reductions during the period of its original contract.

The amendment charges that the foregoing provisions and undertakings of the Bell company were known to, and assumed by the Metropolitan company upon its acquiring the rights of the Bell company.

The amendments then allege that on the 17th day of June, 1880, the complainant purchased the plant of the Western Union company, and paid therefor, in cash, $11,500, which was effected by a transfer, first, to the National Bell of Boston, and, secondly, by a transfer by the National Bell of Boston to the Metropolitan company (which had then acquired all the rights, and assumed all the obligations of the Bell company of New York), and, thirdly, by a transfer by said Metropolitan company to the complainant, all on the same day, and insisting that said several transfers were but parts of one arrangement.

It is also alleged that it was understood between the parties that a new contract in writing, providing for said reduction in rentals, and extending the time of complainant's license to the 1st day of September, 1889, should be made, and that such contract was actually prepared.

By their answer the defendants deny every allegation in the amendments respecting any promise or understanding on the part of the Bell company, or the Metropolitan company, with the complainant for the purchase of the plant of the complainant, with its increased cost by reason of the purchase of the Western Union plant, or for a renewal of the complainant's contract, or for any reduction in the rentals of telephones at any time.

After argument, a preliminary injunction was granted. Ought that injunction to be made perpetual? This depends upon the

Domestic Telegraph Co. v. Metropolitan Telephone Co.

questions, Is there a contract between the parties which the court can enforce? Has such a contract been established?

There were serious disputes between the Western Union company and the National Bell of Boston (under which the New York Bell held its license), which disputes the two companies endeavored to overcome by an agreement to consolidate certain interests. The agreement which they entered into for that purpose bore date November 10th, 1879. By its terms the licenses made by the National or American Bell company were expressly observed and excepted; and the Western Union company agreed that it would, as soon as conflicting interests could be harmonized, transfer to and put under lease, and license from the National Bell company, upon its acceptance and payment for the same, as in said contract was provided, all telephones in said New York territory; and the parties mutually agreed that, " with respect to the telephones and the telephone exchanges and the properties and interests, the transfers of which may be delayed by reason of conflicting claims or interests, as hereinbefore (in said agreement) provided, it is agreed that both parties will use their best endeavors and due diligence to arrange, with their respective licensees and associates, such modification of existing obligations as will allow said transfer to be made at the earliest possible date."

From the obligations which each party thus assumed, it is plain that the New York District and the Bell company and its licensees occupied positions of the highest importance. The Bell company of New York and its licensees were to be consulted. They had rights which were to be considered. Hence, as will appear, came the interview at the Gilsey House, in New York, which interview is the basis of the agreement stated in the amendments. And hence it will also appear that the movement at consolidation bears quite an important part in this controversy. The object in view, by consolidation, could not be fully attained except through the Bell company of New York and its licensees, one of which was the Domestic company of Newark.

I think the first intimation that the complainant had of the negotiations for consolidation was given in a letter written by

Theodore N. Vail to Jabez Feary, October 31st, 1879, nearly three months after the date of complainant's contract. Mr. Feary was then superintendent of the Domestic company, and Mr. Vail the general manager of the National or American Bell of Boston, the company which was at that time carrying on the negotiations with the Western Union for consolidation. In this letter, in referring to the Domestic company, he said :.

"I can only say this : that, as a representative of the B. T. Co. of N. Y., I will never consent to any arrangement that does not give the exchange business to that company."

On April 9th, 1880, the Domestic company had a meeting, which was attended by John D. Harrison, who was not only a director in that company, but also in the Bell company. From the records of the Domestic company it appears that the meeting was called to consider how the consolidations of the New York companies would affect the Domestic company. At that meeting Mr. Harrison stated that some means should be adopted by which the Domestic company should take the plant which had been controlled by the Western Union company, and suggested that a committee be appointed to confer with the New York company, as it had been asked by them that such a committee be appointed. Mr. Harrison announced, at this meeting, that he had attended the meeting of the Bell company of New York, and that that company had requested him to tell the Domestic company that they would like it to appoint a committee of conference with regard to taking up the Western Union plant, the reason for which was that all opposing interests had been consolidated in the Bell company of New York.

At that meeting of the Domestic company a committee was appointed composed of Frederick T. Feary, Jabez Feary and George W. Hubbell. Mr. Harrison was requested to notify the Bell company. This he did by telegram to Mr. Vail, who, besides being an officer in the Bell, was also general manager of the American Bell of Boston. The telegram was in these words :

"The Domestic company have appointed a committee to meet with you. Designate a time and advise."

It will not be amiss to notice and to bear in mind the language of this telegram.  It shows very satisfactorily that there had been a previous understanding between Harrison and Vail.  It shows also that Harrison regarded Vail as all-powerful, or as equivalent to the Bell company itself, for he says " to meet with you," instead of with the Bell Telephone Company, or a committee of that company.  And it will not be out of place to say that the testimony shows that Mr. Vail did acquire such distinction and influence as to give the almost unqualified direction to the affairs of the Bell company of New York.  While he had others about him, his voice was always very potential.

Mr. Vail telegraphed to the Domestic company as follows :

" I will meet you to-morrow night at eight thirty, at the Gilsey House, or to-morrow at ten, at 923 Broadway.   Notify Harrison of this."

From the language employed and from the fact that the meeting at the Gilsey House was April 16th, 1880, this telegram must have been sent on April 15th.   However, April 10th, 1880, Mr. Vail wrote a letter to the Domestic company acknowledging the receipt of the telegram from Harrison, which he said stated that a committee had been appointed to meet with him (Vail) with regard to the purchase of the Western Union company's plant in Newark.   He stated that one of the conditions upon which the Western Union would retire was that their plant should be purchased at actual cost, and adds :

" As that company will have a very considerable interest in the new consolidated company, they object to it unless your company would agree to buy this plant, and also agree that you would assent to the transfer of the contract between the Bell Telephone Company of New York and yourselves to the new company about to be formed.

" These are about all the questions to be determined.

" I wish you would consider them and let me have, at as early a day as possible, your views."

On April 14th, F. T. Feary wrote Vail :

" Regarding yours of 10th inst., would say that our committee have considered the subject matter of your letter and desire to meet you at an early date.   Please appoint time and place."

Then came the telegram, above given, naming the Gilsey House as the place of meeting.

On April 16th, 1880, the two Fearies and Hubbell met Vail, Harrison and Amzi C. Dodd, at the Gilsey House. A protracted conference was then had. Vail, in his letter, above given, said that about the only things to be considered were the purchase of the Western Union plant in Newark and the assent of the Domestic company to the transfer of the contract between the Bell company of New York and the Domestic company to the new company about to be formed. These points were considered at that meeting. It should be borne in mind that, before this meeting, Vail, by letter, announced the fact that a new company was about to be formed, and that through all the subsequent transactions Vail was present performing a most conspicuous and important part. He surveyed every field of controversy and formulated and established every proposition which had life and being in either organization, including the Bell of New York or the Metropolitan, or the New York and New Jersey. This being so, a want of notice cannot be set up by any or either of these companies. And others, though not so prominent or efficient, were likewise chargeable with notice, and in the law carried the truth home to the several organizations.

But though Vail said the only things to be considered were the purchase of the Western Union plant by the Domestic, and its assent to the transfer of the contract between it and the Bell company of New York to the new company about to be formed, it is undeniable that at the conference at the Gilsey House other very important matters were considered, and exacted a great deal of attention, such as private lines and gross rentals.

The complainant insists that another important matter was discussed at that meeting, and that promises of a new contract, extending the original contract the period of five years, were freely and fully made to it by the representatives of the Bell company, and those who afterwards became officers in the Metropolitan company, and the New York and New Jersey company. Were such promises made as, under the circumstances, considering the

subsequent transactions of the parties, ought to bind the defendants?

Let the testimony be read and considered: Hubbell says that at that interview the representatives of the Domestic company insisted that there was no necessity for its buying the Western Union plant, since, if the Bell company bought it, the opposition would cease, and that he said: "If we pay this money we acquire a plant, which is outside of our contract. Now, you have agreed in your contract with us that if you wish directly to operate our territory, either as it is or merged with some other territory, that you shall have the option of buying our plant. But I said, 'How are we going to stand on this property?'" He adds that Vail replied: "If we determine to operate this territory directly—your district directly ourselves—we will buy this property just as we would if we purchased the property under the contract." And then says that either Vail or Dodd said: "And the price you pay will form a basis." Then we said: "Suppose you don't operate directly?" And Vail or Dodd said: "You will then, if you pay the money, continue right on under the present contract." And Dodd said: "We will give you the benefit of any reductions." And he said distinctly: "We think they will be $15." Hubbell says that at that interview "the right of renewal was one of the agreed facts upon which the interview took place."

Mr. Hubbell is fully sustained by the testimony of the Fearies.

If this testimony stood alone or uncontradicted, it might not be difficult to conclude that the complainant is entitled to the aid of this court. But it is most earnestly contradicted. Look at the language of the witnesses. Mr. Vail said:

"I am giving now, of course, what occurred substantially; this matter was discussed at length; they thought that it was exorbitant, and while we may have agreed with them, yet it was impossible to get the plant except by paying the price asked; they were told it would also be necessary to assent in some way, or have a new license or agreement issued to them, bringing them in under the consolidated interests of the November 10th and April 30th agreement, which was not then completed, in order to give them the benefit of the Western Union patents; the question as to, the benefit was discussed, and our argument was that they could afford to buy the Western Union plant,.

even if they paid a great deal more than it was worth, from the fact that it would immediately withdraw the opposition, and give them a clear field, and enable them to do a profitable business, which they could not do as long as the opposition remained there.

"*Q.* Was anything said about a renewal of the contract of August 6th, 1879 ?

"*A.* The probabilities are that that matter was referred to ; it was, in fact, because they asked, among other things—they asked what inducements there would be, or what change would be made in the contract if a new license were taken, and they were positively notified that the contract, so far as the terms were concerned, would be precisely the same as those in the old contract; that the only change would be licensing them under the Western Union patents, and removing the opposition from the field ; that was the essential difference."

Again the question was put to him :

"Was there any conversation there at that interview at all in regard to drawing up a new contract for the renewal of the contract of August 6th, 1879, for five years, or for any other time ? "

To which he answered :

"They probably—I think they asked if we would not give them the benefit of renewal ; in fact, I am positive they did, but they were distinctly told that so far as the terms—the terms of the contract and the material parts of it, there would be no change whatever, but that the old terms would prevail ; that what they would gain under this new license or new contract or agreement would be a license under the Western Union patents, and that was argued to them as being amply sufficient to cover the purchase of the Western Union plant if they had to throw it all away the next day."

He further repeats that there was no agreement of any kind entered into in regard to the renewal of the contract of August 6th, 1879.

Mr. Vail was then asked :

"Was there any conversation upon the subject of rental of telephones ? "

His answer was :

"I don't remember the specific conversation, but generally the question of reduction of rentals by the parent company was discussed, and they were told then, as they had been frequently before, that if the parent company ever made any reduction in the rentals of telephones that they would get the same

Domestic Telegraph Co. *v.* Metropolitan Telephone Co.

benefit that any other licensee would; that the price of telephones was uniform; the rentals of telephones were uniform all over the country; all would get the same benefit."

I pause here in the narration to observe that these remarks of Mr. Vail respecting terms and rentals throw a great deal of light upon the eleventh section of the contract of August 6th, 1879, and show why the terms and rents, the only really important matters, were not referred to more distinctly. The Bell company could not fix the terms until the parent company had first done so. It was not any arbitrary act on the part of the Bell company, but as certain and definite as the contract of the merchant or miller when he says he will take a given number of bales of goods or bushels of grain at a specified future time at the price of such goods or grain in the market at that time. And the force of this view is attempted to be qualified, although it is in fact admitted by Mr. Vail, as will be next seen.

When asked what he means by the phrase " gross rentals," he said :

" Well, the word 'gross rentals' is not generally used. The term 'rentals of telephones' is used to express the price fixed by the American Bell Telephone Company; that company reserves to itself the right to charge—to fix the rental at a certain price, and that is known as the rental of telephones all over the country, whatever price they fix, and that is the same to all companies.

" *Q.* What do you mean by all companies ?

" *A.* Why every company; the rental of telephones is fixed at so much.

" *Q.* Yes ?

" *A.* Then, some companies are allowed commissions for renting them, the same as commissions for selling goods, and things like that.

" *Q.* What is the difference between an exchange plant, or a company running an exchange like the Domestic company, and a company situated as the Metropolitan Telephone Company is, having license from the American Bell, and having its relations with that company ?

" *A.* The difference is that the American Bell company technically knows nothing of the Domestic company; it has no business relations with it; the business relations are entirely with the Metropolitan company, and the Domestic company goes to the Metropolitan company and not to the American Bell company to transact its business; it is a sublicensee, as we call it."

After all this, Mr. Vail's attention was again called to the subject of renewal of the contract of the Domestic company in

case it purchased the Western Union plant, and he was told that Jabez Feary swore that they were given to understand that the contract would be renewed, and that rentals would be reduced to $15 instead of $20, when he said :

"I don't know that anything was said upon the subject of renewal of the contract, but they were given to understand very distinctly that the term of the contract or the condition would not be changed in any way. * * * As to the rentals of telephones, they were told that the rentals of telephones would be made to all alike, and that whenever a reduction was made there was no reason why they should not get the benefit of it."

But he said that this conversation in regard to reduction formed no part of, and had nothing to do with, the purchase of the Western Union plant.

Since Mr. Vail's character requires that what he said should have the highest consideration, it is due to him to say that he denies that there was any understanding or agreement, or proposition for an agreement, that the contract should be renewed, either at the Gilsey House or anywhere else, at any time, or that anybody was authorized to have such an understanding, or to make any such agreement, or to entertain any such proposition. And yet, notwithstanding this most comprehensive assertion and denial, he had before admitted, twice, that the representatives of the Domestic company did ask for a renewal of their contract.

But Mr. Vail is supported in his flat denial by Mr. Dodd, who was a member of the board of directors of the Bell company and of the executive committee, and present at the Gilsey House interview. He declares that there was never any authorization to the executive committee of that company, or to any of its officers, to propose to the Domestic company a renewal of the contract of August 6th, 1879, or to make any contract. He was also a member of the board of directors of the Metropolitan company, and was a constant attendant at its meetings, and says that no such authorization was ever given by that company (which company was not organized until at least a month after the Gilsey House interview, although all arrangements were being then made to effect and complete such organization). He

also declares that he never heard of any such claim for renewal until after the amendments were filed.

In speaking of reductions, Mr. Dodd declares that he never said that the Domestic company should have the benefit of any reductions made, nor that anybody else ever said so to his knowledge. Yet, it seems to me in this particular he is contradicted by Mr. Vail. When asked if he said that he thought the rentals would be $15, he said he had no recollection of it whatever, nor any recollection of ever hearing the same mentioned, and was immediately asked:

"What was said, if anything, on the question of reduction?"

To which he answered:

"Mr. Vail said that the gross rentals—that the price, so far as the contract of the Domestic company was concerned, stood fixed at $10, that being the gross rental fixed by the parent company for the rental of telephones, and that if a general reduction was made by the parent company to its licensees, that while the rental for the Domestic company was fixed absolutely at $10, yet it would be fair, and he would be willing to meet the reduction."

Again, when distinctly asked if anything was said at the Gilsey House on the subject of renewal, he said there was nothing, nor was there any understanding or agreement that the contract of the Domestic company should be renewed; but, notwithstanding these declarations, this followed immediately:

"*Q.* Do you recall anything that was said upon the subject of renewal?
"*A.* The subject of renewal was talked about."

But afterwards re-affirmed his former denial thus:

"In no shape or manner whatever, to my knowledge or understanding, did the question of the renewal of the contract enter into the consideration in the agreement for the purchase of the Western Union plant."

But it will be seen that in this instance the denial comes with the limitation that it had nothing to do with the purchase of the Western Union plant.

17

Upon cross-examination, Mr. Dodd was inquired of:

"Now, was anything said about the other alternative, namely, as to how they, the Domestic company, would stand in case the Bell company, or the new company, at the expiration of the contract, did not decide to purchase, and did not want to work the district themselves, either alone or merged with any other district, what then would be their, the Domestic company's, *status* if they purchased the Western Union plant?"

To which he replied :

"They asked if, in case they purchased the Western Union plant, they would get a renewal of their contract, and the subject also came up of a reduction in the rental of telephones."

And again he says :

"My impression was that they desired to make some new terms as a condition of the purchase of that plant."

Mr. Dodd also says that the American Bell company alone had the fixing of the price or rentals of telephones, and "that if any reductions were made to other licensees, that it would only be fair to the Domestic company that the same reduction be made to them."

He adds :

"He, Vail, used the words, 'A corresponding reduction should be made to them,' * * * and that while the contract provided for a specific rental by the Domestic company, that he should be in favor of giving them the benefit of such reduction."

Mr. Harrison, who was a director in both companies at the time of the Gilsey House meeting, and afterwards in the Metropolitan company, swears that in discussing the matter with the officers of the Domestic company, he said to them :

"Now let us get—if there is to be any reduction—let us get Mr. Vail to promise to give it to the Domestic company, provided it is made. So that matter Mr. Hubbell brought up (that is, at the Gilsey House interview), growing out of a suggestion I had made previously; and that was argued,

and I did not know, of course, how Mr. Vail would take it all; but I was surprised and gratified to see that he was willing to say—favored the idea of giving us (I now speak of the Domestic company) any deductions that the National Bell made in their rates; although we knew, both of us—or all of us —that we could not demand it as a right, it seemed to be very fully promised, as far as Mr. Vail said himself, we should have the benefit."

He says :

" I think Mr. Vail gave them fully to understand, and they were satisfied. I was satisfied that they should stand on the same idea and basis as though it was the original plant, and it should be paid for, purchased, or if it was not we would have the first preference for a license, or a new license.

" *Q.* Did Mr. Vail say, at that meeting, that if they did not purchase, the Domestic company should have the first preference for a license, or a new license ?

" *A.* Why, of course he did."

He says:

" Mr. Vail discussed that point very plainly. * * * · ' We cannot provide for a contingency in the future in the telephone plant;' something to that effect; ' you have got over four years to run yet, and you have got the first preference, if the company do not run it themselves or merge it,' and spoke as though our interest, the Domestic's interest, was sufficiently guarded and covered in the eleventh clause of our contract."

He adds that the eleventh clause was not mentioned " particularly, but it was brought in as though it was our protection and safety."

After the foregoing statements from the testimony are considered, it will require no discussion to satisfy the most careless observer that a new contract was talked about and urged upon the committee who represented the Bell company. Hubbell, Frederick T. Feary, Jabez Feary, Vail, and Dodd and Harrison, all agree thus far. The three former swear that the promise was made to them that the Domestic company should, if it purchased the Western Union plant, continue for another five years under its present contract. This both Vail and Dodd deny. Whatever besides Harrison may say about it, he swears that Mr. Vail

promised the Domestic company should have the first preference for a license, or a new license.

In their very able arguments, counsel for defendants maintained that whatever talk there was at the Gilsey House interview concerning a new contract, or a renewal of the original one, it had reference to the provisions of section 11 of the original contract, and to them only. The testimony of Harrison, last above quoted, very strongly supports this contention. It is true Vail and Dodd say that Vail constantly affirmed that in case the Domestic company purchased the Western Union plant, and consented to come under the new arrangement, there would be no change made in the terms of the contract.

Now, it is perfectly obvious to my mind that Vail and Dodd may speak the truth exactly as far as they go, yet not the whole truth. I think Harrison more fully gives the understanding at that time of the representatives of the Bell company. He says that the Domestic company was to have the first preference for a new contract or license, and that the representatives of that company were referred to the eleventh clause in their contract as their protection.

This statement of Harrison very fully harmonizes with the recollection of complainant's witness, who says that it was promised them that they should continue right on another five years under their present contract, and that they should be treated fairly. It is true they, in this, vary : the former understood Vail to refer to the contract as a whole, while Harrison understood him to refer to the eleventh section only.

At this stage of the inquiry it is befitting to remark that the testimony abundantly shows that at the time of the meeting at the Gilsey House the struggle for the existence of the Domestic company's plant was still going on ; that complete success, or, at least, any great degree of prosperity was not yet assured ; that the assiduous and protracted effort at consolidation was inspired by the sincere desire of the American Bell, the Bell of New York, and the men who expected to compose the new company (now the Metropolitan, one of the defendants), to remove the conflicts which interrupted business, and rendered the triumph of the

Domestic Telegraph Co. *v.* Metropolitan Telephone Co.

enterprise doubtful; that it was conceded that the territory covered by the license of the Domestic company was of great importance, as the opposition of the Western Union therein was most determined and aggressive, with the youthful stripling, the Domestic, its only antagonist; and that, because of all these considerations, there was an exceedingly friendly business relation towards the Domestic company; and that, at the Gilsey House meeting, Vail, Dodd and Harrison talked face to face with Hubbell and the two Fearies, as friends talked with friends. Their cause was a common cause. All joined hands to effect a great object—the overthrow or removal of the opposition carried on by the Western, Union. These things are all indelibly impressed upon this case. The cordial and extended interview at the Gilsey House is a verification of this mutual regard and trust for each other's business welfare.

Considering these facts, and also considering Mr. Harrison's position as an office-bearer in both companies, and the very important fact that he was constantly encouraging the Domestic company to take advantage of the existing crisis to secure an extension of its contract, and leading them on to the belief that it could be accomplished, all will, at once, admit that his statements of what took place at the Gilsey House and afterwards, about a new contract, or an extension of the existing one, ought to have great weight as against the defendants. As I read his testimony, including what is given above with what is added respecting the preparation of a new contract, he unquestionably understood that such new contract was promised the Domestic company, at the Gilsey House, if the Domestic company paid the alleged cost price of the Western Union plant.

Harrison continued thereafter to talk to the Domestic company about the new contract as though it was a certainty. He told the officers that a contract was being prepared, which would secure them the plant at Newark for five years longer. That he said this to the board of directors is established. One witness says that Mr. Harrison said:

"Now everything would go along smoothly, and our license would be re-

newed, and we would get a reduction in rental, * * * and, furthermore, he said that an agreement had been drawn up for a renewal, and that he was willing to go into a court and swear to that."

These remarks were made in 1884, at a time when a circular appeared saying that, September 1st, 1884, the territory of the Domestic company would revert to the New York and New Jersey company. A most reputable witness says that Harrison then said:

"That if he had had any idea that question would have arisen in regard to our right to this contract, he should have insisted upon the thing being closed up at a very early date in the transaction between the two companies."

Now, I am aware that Mr. Harrison himself, in his ....tements, makes every effort to qualify or wholly negative the admissions which others say he made. But seven gentlemen, equally worthy of credit, swear that he repeated the statements above set forth, or similar ones, at different times after the Gilsey House interview. Hence it is that I think, in these admissions and statements of Harrison, there are additional grounds for the conviction that a renewal of the contract was promised at the Gilsey House.

However, no contract was concluded there. The officers of the Domestic company had no authority to make a contract, but only to inquire and report. They reported.

The offer or promise of the committee of the Bell of New York made to the committee of the Domestic company was never recalled nor qualified. Nor was there ever any other formal interview or negotiations before the formal announcement of the Metropolitan company (by that time having been formed according to previous understanding with the Domestic company), that it was ready to turn over the plant of the Western Union in Newark. The Domestic company raised the money and paid for this Western Union plant without the slightest intimation that it might expect any diminution of the articles considered at the Gilsey House. By that act every substantial promise made at the Gilsey House was sealed. By that offer of the Metropoli-

tan and that acceptance of the Domestic company, each party had the other in bonds, and no part of the contract could be avoided at the option of either.

Counsel for defendants urge that contracts are never made to depend upon such loose conversations as took place at the Gilsey House. This view is certainly entitled to careful consideration. It is of the first importance for the court to know whether such an interview is inspired and quickened for the purpose of a sort of club-house talk about business or for the purpose of negotiations for a solemn contract. If it be the latter, the court cannot say that anything said about the object in view is loose. Nor can I be induced to consider the conversation at the Gilsey House loose. Let the importance of the questions involved be considered. Let the character of the respective companies be considered. And let the character of the officers who represented them be considered. Would such a man as Vail or Dodd or Harrison want it known that in the midst of the controversies going on between the American Bell and the Western Union, when sent on a most important mission, he trifled away hours of important time by indulging in loose conversations respecting the business in hand? The court cannot thus condemn such men, even though it be sought for at the cost of so much humiliation, for selfish purposes.

Again, this view is strongly fortified by the transactions of the parties in bringing about this interview. Every circumstance shows that it was intended to be a business meeting. Mr. Vail and the other members of his committee formally asked that the Domestic company should appoint a committee to meet a committee of the Bell of New York, and when such committee had been appointed, Mr. Vail fixed a time and place, and traveled from Boston to New York to carry on the negotiations.

But what is more conclusive still that the interview at the Gilsey House was in the nature of real negotiations, and not "loose conversations," is the fact, already adverted to, that the Metropolitan company, without more, acted upon those negotiations, and informed the Domestic company of its readiness to

turn over the Western Union plant in Newark, and proceeded to do so most methodically.

Hence, I conclude that I would be doing all concerned great injustice to pronounce that the Gilsey House interview was anything less than one of solemn negotiation.

Again, counsel for defendants, with great skill and force, insisted that whatever allusions may have been made at that interview to a new contract or to an extension of the contract of the Domestic company, such allusions were all referable to the provisions of section 11 of the contract of August 6th, 1879, or to the new contract contemplated between the new company about to be formed (that of the Metropolitan) and the Domestic company, by which the Domestic company was expected to accept a license from the Metropolitan instead of from the Bell of New York, and proceed under such license from the Metropolitan for the remainder of the first five years, and nothing more.

There is great force in the former statement, but I can see none in the latter, without at the same time regarding the representatives of the Domestic company simply blockheads in business. It cannot be contended that the difference between the two propositions is not very distinct, nor can it be concluded, from mere inference, that the gentlemen from Newark were unable to comprehend the difference, or that they were beguiled by the brightening prospects into an acceptance of · every offer without consideration or reflection. The proof shows that they were extremely cautious.

I have said there is force in the insistment that whatever was said about a new contract, or an extension of the former one, had reference exclusively to the eleventh section of the former contract of August 6th, 1879, and that there was nothing binding upon the defendants under that section. This view is sustained, too, by the fact that complainant filed his original bill, relying exclusively upon the eleventh section for a decree compelling specific performance.

However, as I have found above, I think a renewal was promised. I conclude that the promise was not limited to such

rights as the Domestic company had under section 11 ; but a promise that it should have the benefit of a license for another five years absolutely.

And, when the additional period was talked about, I cannot believe that Vail was double-dealing in any sense. He knew, beyond all peradventure, that the Domestic company wanted to be assured of a new license if the parent company did not work or merge the Newark district, and I cannot suppose that he designedly misled its representatives by referring them to the eleventh section, knowing or believing that it conferred no rights. And hence I conclude that if Vail did refer to section 11, and did not go beyond that, he honestly intended thereby to assure the Domestic company that its license would be renewed if the contingency contemplated in section 11 arose. Let us take Harrison's interpretation of what Vail said. In speaking of what was said as to the standing of the Domestic company at the end of the first five years, if it purchased the Western Union plant, and the parent company should want to run the district itself, he said :

"I think Mr. Vail gave them fully to understand, and they were satisfied and I was satisfied, that they should stand on the same idea and basis as though it was the original plant, and it would be paid for, purchased, or if it was not, we would have the *first preference for a renewal of the license, or a new license.*

" Q. Did Mr. Vail say, at that meeting, if they did not purchase, the Domestic company should have the first preference for a license, or a new license ?

" A. Why, of course he did."

He adds :

" Mr. Vail discussed that point very freely. * * * You have got over four years to run yet, and you have got the first preference if the company do not run it themselves or merge it, and spoke as though our interest, the Domestic interest, was sufficiently guarded and covered in the eleventh clause of our contract."

Supposing that Mr. Vail did nothing but refer to the eleventh section, I conclude that, under the circumstance, it was to increase and to strengthen the safety of the pledge of renewal

under that section, as he then understood it, which, I believe, was that it gave the right to renew. Harrison, however, swears that he understood that Vail promised the Domestic company the first right to a renewal, or a new license. It seems to me that when in a contract of this nature there is a clause which provides that one of the parties shall have the first right to a new contract (not a renewal of the existing one), upon such terms as shall be fixed upon by the other party, and, during the continuance of such contract, new terms are added upon the assurance that such clause gives the right to renew or will fully protect the right to renew, a court of equity ought to enforce such contract and secure its renewal to the party to whom such promise is made, if the terms contemplated in the clause giving such first right have been fixed, or any principle acknowledged by the party to be bound by which they can be ascertained. The case in hand is such an one. I think one great consideration moving the Domestic company was such assurance from Mr. Vail.

But still another point was pressed against the complainant because of his claim under the amendments. It is thought that this claim of promise to renew had no foundation in fact, and that this is shown by the fact that a matter so vital to the case was not set up in the original bill. Certainly this arrests the attention of every one. It is of great consequence in determining the rights of the parties under the evidence.

But still, the question is, Was there any such promise? The existence or non-existence of the promise cannot be determined by the absence of any allegation of the fact in the bill. If every material part of the Gilsey House interview had been reduced to writing in form of a binding contract, and it had been forgotten until some great emergency quickened the memory of the interested, I cannot think that, in the present age, any court would deprive either party of its benefit because it was so long forgotten. No, the only question would be, Does such a document exist?

Taking the case as I have it before me, I find that all parties agree that there was a meeting at the Gilsey House, formally called by Mr. Vail or the Bell company of New York; that the Domestic company was informed beforehand, by Vail, of the

objects of the meeting, and so had ample time to consider its course and rights; that at that meeting there was protracted discussion, and that the representatives of the Domestic company certainly made the inquiry as to where it would stand in case it bought the Western Union plant, and the new company did not operate the Newark district itself nor merge it. I have no doubt but the subject of renewal formed one of the most important parts of the negotiations. And I conclude that an effectual promise to renew was given. Being thus satisfied of the existence of the fact, I cannot discover any other fact or rule that would justify me in not giving it due weight because it was forgotten until a critical period in the cause. I think every member of the bar of long experience has seen cases won and lost by amendments made during the progress of the trial upon testimony disclosed in the presence of the court, and until then out of mind of the prevailing party.

I shall advise a decree in accordance with the prayer of the bill, as amended. The complainant is entitled to costs.